**UNITED STATES of America, Plaintiff,**

v.

**John Daniel SLEDD, Defendant.**

**No. 83 C 581.**

United States District Court,
N.D. Illinois, E.D.

Nov. 10, 1983.

Daniel Wm. Gillogly, Asst. U.S. Atty., Laurie N. Feldman, Legal Intern, Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff.

Sam P. Bradley, Memphis, Tenn., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

John Daniel Sledd ("Sledd"), originally convicted in case No. 80 CR 252 in this Court, has moved for resentencing pursuant to 28 U.S.C. § 2255 ("Section 2255").[1] Sledd's present counsel argues Sledd was denied the right to appeal his conviction as the result of his trial counsel's failure to file a timely notice of appeal. Essentially Sledd's position is that trial counsel fraudulently failed to file an appeal while promising he would do so. In an unpublished May 12, 1983 opinion and order this Court (1) found that charge—if true—would constitute a denial of Sledd's Sixth Amendment right to effective representation of counsel and (2) therefore set the motion for hearing July 1, 1983. See *Calland v. United States*, 323 F.2d 405 (7th Cir.1963); Rule 8 of the Rules Governing Section 2255 Proceedings. For the reasons set forth in

---

1. Section 2255 resentencing is procedurally equivalent to the initial sentencing. Thus the time during which an appeal or a Fed.R.Crim.P. ("Rule") 35 motion can be filed begins again. While Section 2255 is typically used to revive a defendant's right to appeal, Sledd apparently seeks to use the motion to revive his right to a Rule 35 reduction of sentence.

Counsel for Sledd's codefendant Bobby Howell ("Howell") did file—though it was never pursued—a notice of appeal. Because the forgotten appeal was not formally disposed of until its dismissal by the Court of Appeals and the return of the mandate to this Court November 29, 1982, Howell was able in December 1982 to file a timely Rule 35 motion to reduce his July 1981 sentence. Consequently Howell, who like Sledd had already once received a substantial diminution of his sentence under Rule 35, has had a second chance at a reduction while Sledd has not.

these findings of fact and conclusions of law, Sledd's motion for resentencing must—with regret [2]—be denied.

### Findings of Fact ("Findings")

1. On June 8, 1981 a jury returned a verdict of guilty on multiple charges of wire fraud and mail fraud against codefendants Sledd and Howell. Later the same day the codefendants, along with one of Sledd's lawyers (either Victor Ciardelli ("Ciardelli") or Herbert Rothbart ("Rothbart")), proceeded to the probation office and met with Probation Officer Butler Sharpe ("Sharpe") in connection with the preparation of presentence reports. Neither defendant offered his version of the facts surrounding the crime, because the lawyer said an "appeal was to be taken." Sharpe recorded that statement in his notes.

2. On July 24, 1981 the defendants appeared before this Court for sentencing. Sledd received a heavy sentence totaling 12 years' incarceration and $114,000 in fines, while Howell's sentence (reflecting his greater degree of culpability) was even heavier: 15 years' incarceration and $114,000 in fines. However, this Court promised to reconsider each sentence if the defendant cooperated with the government in identifying the location of any money that had been taken out of the country in the course of the crime.[3] Sledd was surprised and upset at the severity of the sentence.

At least Sledd's trial counsel and perhaps Sledd as well felt the sentence changed the circumstances substantially from those that existed on June 8, because the heavy sentence increased the importance of securing a reduction in sentence in comparison to the importance of pursuing an appeal in hopes of setting aside the verdict.

3. Sledd conferred with his lawyers after sentencing. Ciardelli presented Sledd's decision as one between cooperating with the government (in an effort to secure a reduction of sentence) and pursuing an appeal. Ciardelli saw those actions as alternatives, because cooperation would involve giving the government further facts about the crime that could be used as admissions or even a confession in any future retrial (which would be the only consequence of a successful appeal). During the conference Sledd knew of his right to appeal and knew it would cost about $7,500 for Ciardelli and Rothbart to pursue that appeal. Ciardelli advised Sledd cooperation would be the best course of action and said he believed an appeal would not be successful. On at least one occasion Sledd expressed a desire to "get it over with." Sledd ultimately decided to cooperate with the government.

4. On July 30 FBI Agent Jenkins sent an airtel to FBI headquarters. Among other things he said the case was on appeal. Jenkins' information about the case subsequent to sentencing could have come from

---

**2.** See Appendix.

**3.** Based on the trial record, a very large part of the proceeds of the mail fraud scheme—several hundred thousand dollars—appeared unaccounted for. There were large unexplained wire transfers, and the evidence pointed to the Cayman Islands as the likely haven for what might be a large cache of Howell-Sledd fraudulently-gotten gains. Because of the bank secrecy laws of the Caymans, the government's pretrial and during-trial investigation had been thwarted, with confirming secrecy orders issuing from the Cayman Islands' highest court, referring specifically to this Court and the criminal proceeding and barring disclosure. Indeed even after sentencing, with Howell and Sledd cooperating fully and even traveling to the Caymans with government representatives, it proved enormously difficult and time-consuming to get information there. In the end,

though, with all available facts before this Court, it appeared there was in fact no El Dorado in the Caymans. That, together with Howell's and Sledd's full cooperation with other governmental investigations (including not only prosecutorial investigations but one by the United States Senate), led this Court to grant a major Rule 35 reduction to both Howell (cut from 15 years to 5 years) and Sledd (cut from 12 years to 4 years) on January 4, 1982. Because of the fortuitous—and unintended—circumstances of Howell's forgotten appeal (see n. 1), this Court's Rule 35 jurisdiction continued to permit Howell still further relief at a much later date, based on personal hardship. But because of the circumstances described in this opinion, Sledd was foreclosed from any added Rule 35 relief, though his own family circumstances and hardships were at least as great.

either Assistant United States Attorney Ludwig Kolman, who was in periodic communication with Ciardelli, or from Sledd himself or both.

5. Howell's attorney Marc Kadish did file a notice of appeal on Howell's behalf. No action whatever was taken to pursue the appeal, which was ultimately dismissed by the Court of Appeals on its own motion (see n. 1). Indeed Kadish testified there had never been a serious intention of prosecuting the appeal, and he actually sent forms to Howell for withdrawal of the appeal. Just as Ciardelli advised Sledd, Kadish told Howell he could not both cooperate and pursue the appeal.

6. No notice of appeal was filed by Sledd's lawyers. Ten days to three weeks after sentencing, when Ciardelli talked to Sledd, Sledd told him of his progress in cooperation with the government and Ciardelli indicated in passing he had not filed a notice of appeal. Sledd did not criticize or question Ciardelli's failure to file such notice. Though he testified at the hearing he then felt there was no use crying over spilt milk, that explanation of his silence represents a wishful post-hoc rationalization (perhaps not intentional, and understandable in light of Sledd's present circumstances). In fact Sledd's conduct in not objecting at that time is consistent with his having concurred in the choice of full cooperation as an *alternative* to appeal.

*Conclusions of Law ("Conclusions")* [4]
*Fraud Theory*

■ 1. Any fraudulent promise to appeal by a defendant's attorney would constitute a denial of the defendant's right to effective representation of counsel under the Sixth Amendment. *Mack v. Smith,* 659 F.2d 23, 25 (5th Cir.1981) and cases there cited, including *Atilus v. United States,* 406 F.2d 694, 697–98 (5th Cir.1969); *Calland,* 323 F.2d at 408. In turn a denial of effective representation would entitle the

defendant to resentencing under Section 2255 and a recommencement of his right to appeal.

2. Even though a criminal defendant and his attorney stand in a fiduciary relationship, the type of fraud required under *Mack, Atilus* and *Calland* is fraud in the traditional sense and not mere breach of fiduciary duty. *United States v. Robinson,* 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed.2d 259 (1959) expressly held mere excusable neglect cannot justify an extension of time during which an appeal must be taken. Granting relief for fraud by a defendant's attorney is based on the inherent power of the court to set aside a judgment procured by fraud. *Calland,* 323 F.2d at 408. That power extends only to traditional fraud and not to constructive fraud or breach of fiduciary duty. Traditional fraud involves misstatement,[5] materiality, reliance and scienter.

■ 3. Because there was no scienter by either Ciardelli or Rothbart, there could have been no fraud in the required sense. At the time of the verdict, when either Ciardelli or Rothbart indicated to Sledd either directly or indirectly through Sharpe that an appeal would be taken, there was no intent to deceive Sledd on that score. Appeal was in fact contemplated. It was only later, after sentencing, that matters changed. At that time Ciardelli thought in good faith Sledd did not want to file an appeal. That belief was based on Ciardelli's presentation of the options of appeal and cooperation as alternatives and on Sledd's decision to cooperate.

4. In finding traditional fraud was not present, this Court does not at all discredit Sledd's testimony as an intentional misstatement of his then state of mind; it was not. It may be that even as Sledd was cooperating with the government he expected an appeal to be filed—though it seems far more likely his undivided atten-

---

**4.** To the extent if any these Conclusions reflect any factual findings, they shall be deemed Findings and therefore part of the basis for these legal Conclusions.

**5.** "Misstatement" may of course take the form of an implied misstatement or a material omission. *Atilus,* 406 F.2d at 698.

tion was focused on the cooperation that he hoped would—and that did in fact—produce a major reduction in his sentence. But what is critical is that Sledd never testified he either expressly told Ciardelli to file an appeal after sentencing or questioned Ciardelli's good faith presentation of the options as cooperation or appeal, but not both. Neither Ciardelli nor Rothbart fraudulently failed to file an appeal while promising to do so, and that negates Sledd's present claim asserting such fraud.

*Waiver Theory*

■ 5. Sledd now also argues he was constitutionally entitled to an attorney who not only did not defraud him of his right of appeal but who enabled him to make a knowing and intelligent waiver of his right to appeal. To evaluate that position it must be recognized the right of appeal is just one aspect of the right of effective assistance of counsel and does not stand alone as an independent right under the Constitution. *Rodriquez v. United States,* 395 U.S. 327, 329, 89 S.Ct. 1715, 1716, 23 L.Ed.2d 340 (1969) (citation omitted, brackets in original) characterized the right to appeal as a product of "[p]resent federal law," while *Robinson,* 361 U.S. at 226, 80 S.Ct. at 286 said:

The right of appeal in criminal cases in federal courts is of relatively recent origin.

As *Norris v. Wainwright,* 588 F.2d 130, 137 (5th Cir.), *cert. denied,* 444 U.S. 846, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979), put it:

The right to appeal is not a component of the sixth amendment nor is it a constitutional right we seek to protect for its own sake.

6. Knowing and intelligent waiver of nonconstitutional rights cannot fairly be a required component of the constitutional right to effective assistance of counsel. Such a requirement would make no sense, for it would replace the judgment of counsel with an obligation on counsel to educate his client as to all available legal options.[6] Furthermore a knowing and intelligent waiver requirement would cause post-conviction review to be cumbersome and highly speculative. Whenever the right of appeal is waived the court would be required upon request to conduct an investigation into the state of the defendant's mind at the time the decision not to appeal was made.[7]

7. Thus this Court follows *Norris,* 588 F.2d at 137:

We therefore conclude that there is no requirement under either the Sixth Amendment or the Fourteenth Amendment that in addition to knowing his appellate rights, a defendant must also knowingly and intelligently make a decision not to appeal before it can be said that defendant is not entitled to appellate review of a criminal conviction.

*Norris* (*id.*) not only reviewed the authorities on the question but also recognized, as the necessary result of its analysis, that a criminal defendant must actively pursue his right of appeal once he learns it exists:

A defendant properly informed of his appellate rights may not "let the matter rest," *Worts v. Dutton,* 395 F.2d 341, 344 (5 Cir.1968), and then claim that he did not waive his right to appeal.

Accordingly the right to appeal is protected solely by the enforcement of the right to

---

**6.** It would be difficult to distinguish a requirement that the right to appeal must be knowingly and intelligently waived from (for example) a requirement that the right to object to the presentation of hearsay evidence must also be knowingly and intelligently waived. Attorneys are permitted to waive evidentiary objections on behalf of their clients because an attorney's control over tactical decisions is not seen as inconsistent with the right to effective assistance of counsel. Similarly the decision not to appeal can be a tactical one, especially as here where the attorney perceived cooperation with the

government would eliminate any possible benefits from a successful appeal and retrial. See Conclusion 9.

**7.** It is doubtful any facts could be alleged that would establish as a matter of law a defendant had the requisite state of mind to waive his right to an appeal. Because states of mind can rarely if ever be conclusively proved by facts apart from the actor's own testimony, a hearing would have to be held in all or nearly all instances in which one was requested.

effective assistance of counsel and not by any independent "knowing and intelligent waiver" standard.

8. In *United States v. Weston*, 708 F.2d 302, 306 (7th Cir.1983) our Court of Appeals reviewed the standards for ineffective assistance of counsel, quoting from *United States ex rel. Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir.), *cert. denied*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975):

> To prove a claim of ineffective assistance of counsel a defendant must demonstrate that counsel provided representation amounting to "grossly incompetent professional conduct" or "representation which is in any aspect ... shockingly inferior to what may be expected of the prosecution's representation."

With regard to the right of appeal, it appears counsel's assistance is ineffective in constitutional terms only if counsel fails to inform the defendant he has a right to appeal in a criminal case. *Norris*, 588 F.2d at 137; see *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *Macon v. Lash*, 458 F.2d 942, 950 (7th Cir.1972).[8]

■ 9. Even were there a "knowing and intelligent waiver" requirement, Sledd was effectively advised by counsel regarding his right to appeal. It is undisputed Sledd was informed of his right to appeal on July 24. Indeed Ciardelli, Rothbart and Sledd all recall $7,500 was quoted to Sledd as the price of an appeal. Even if counsel's advice were held to the higher standard, it would still pass muster. Ciardelli understood the best Sledd could hope for in an appeal would be a new trial at which evidence of his cooperation with the government could be introduced. At worst Ciardelli could be accused of (a) failing to explain adequately why he suggested Sledd choose between appeal and cooperating and (b) failing to explain Sledd had at least a technical ability to do both. Because Ciardelli's advice that Sledd choose one course or the other was competent and well founded, Sledd must be found to have knowingly and intelligently waived his right to appeal, even if that were the standard.[9] In any event Ciardelli's advice certainly was not "shocking."

\* \* \*

In accordance with the foregoing Findings and Conclusions, Sledd's motion for resentencing pursuant to Section 2255 is hereby denied. For the reasons expressed in the Appendix, however, a copy of this opinion is being sent to the Bureau of Prisons for its consideration.

## Appendix

Sledd is being crushed—unfairly it seems to this Court, even though the applicable rules of law compel it—between the upper millstone of the principles expressed in this opinion and the lower millstone of the jurisdictional limitations of Rule 35. Proportionality in sentencing is a critical factor in the "justice" component of the criminal justice system. From the lengthy criminal

---

**8.** Although *Anders* and *Macon* apply by their terms only to court-appointed counsel, in the Seventh Circuit the standard for ineffective assistance of counsel "applies whether counsel is appointed or retained." *Weston*, 708 F.2d at 306 (citation omitted).

**9.** From any objective perspective Sledd must be concluded "knowingly and intelligently" to have joined in the decision not to appeal. After all the only factors that could have entered into the equation at the time the decision was made were those of which Sledd was fully informed (and as to which his ability to make an intelligent decision is unquestioned):

1. Further disclosure and full cooperation with the government was necessary to create the potential for Rule 35 relief from a very

long period of incarceration—relief Sledd actually derived as the direct result of that disclosure and cooperation.

2. All that could be gained from a *successful* appeal (a long shot in any case, based on counsel's informed judgment) would be a new trial. And at a new trial, the new information gleaned from the post-conviction disclosure and cooperation would put the government in a far better position for a new conviction. No one could have anticipated the factual need, at a future date, for a *second* round of Rule 35 relief when the decision not to appeal was made. Failure of Sledd's counsel (or even Sledd himself) to have been that prescient cannot render Sledd's decision unknowing or unintelligent.

trial in this case it seemed clear the culpability of Sledd's colleague Howell was greater than Sledd's. For that reason Howell's initial sentence, as imposed by this Court, was longer than Sledd's: 15 years as against 12, in each instance by operation of consecutive sentences. When each of them later obtained Rule 35 relief as the result of the disclosure and cooperation referred to in this opinion, this Court maintained the same relationship between their sentences based on their relative degrees of culpability:

1. It changed Howell's multiple sentences from consecutive to concurrent, thus reducing the maximum term of commitment from 15 to 5 years.

2. In Sledd's case it not only made the change from consecutive to concurrent, but it also *reduced* the individual 5-year terms to 4 years, so Sledd's maximum term of commitment remained less than Howell's.

Now however Howell's purely fortuitous, non-serious and non-pursued filing of a notice of appeal has enabled this Court to take a further and much later fresh look based on a new factor—serious family hardship—and to grant him further Rule 35 relief. Sledd's family circumstances are even more pitiful, even excruciating, but Rule 35 is jurisdictionally unavailable to permit this Court to act on them. And the legal rules spelled out in this opinion preclude revival of Rule 35 jurisdiction.

Howell is apparently about to be released to a halfway house preliminary to ultimate release, despite a greater original degree of culpability on his part. Sledd by contrast has several times been rejected for relief by the United States Parole Commission, so that he will have to "max out" his term. Little wonder that, though this Court does not mean to depreciate the seriousness of the offenses of which each was convicted, this Court has wrestled with the most recent hearing to determine whether Sledd could arguably be entitled to Section 2255 relief so that he could be accorded justice.

In good conscience this Court has been unable to reach such a result. Sledd's fate remains with the Bureau of Prisons and its Parole Commission. Because of this Court's deep sense of unfairness at the end result of the inexorable operation of the rules of law this Court must apply, this opinion and this Appendix are being sent to the Parole Commission with the hope it might reconsider Sledd's situation on its current merits.